1

2

3                        **UNITED STATES DISTRICT COURT**

4                       **NORTHERN DISTRICT OF CALIFORNIA**

5

6   **UNILOC 2017 LLC,**                    | **ORDER GRANTING MOTIONS TO DISMISS**

7                          Plaintiff,        | Case Nos. 4:20-cv-04355-YGR;
                                             | 4:20-cv-05330-YGR; 4:20-cv-05333-YGR;
8   v.                                       | 4:20-cv-05334-YGR; 4:20-cv-05339-YGR;
                                             | 4:20-cv-05341-YGR; 4:20-cv-05342-YGR;
9   **GOOGLE LLC,**                          | 4:20-cv-05343-YGR; 4:20-cv-05344-YGR;
                                             | 4:20-cv-05345-YGR; 4:20-cv-05346-YGR
10                         Defendant.

11

12

13          Plaintiff Uniloc 2017 LLC brings these eleven patent infringement actions against

14   defendant Google LLC for infringement of certain patents.  After pending in the Eastern District

15   of Texas since late 2018, the cases were transferred, and now before the Court is Google's motions

16   to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Google asserts that

17   Uniloc 2017 has not been injured by Google's alleged infringement because it lacks the right to

18   exclude Google from practicing the invention and therefore lacks standing.  Moreover, Google

19   argues that Uniloc 2017 lacks "all substantial rights" in the asserted patents to have a cause of

20   action under the Patent Act.  Having considered the papers and pleadings in this action, the Court

21   **GRANTS** Google's motions.

22   **I.      BACKGROUND**

23          Uniloc 2017 is one of multiple Uniloc entities that have frequently asserted patent

24   infringement in federal courts.[1]  Uniloc 2017 acquired the patents-at-issue from its predecessor,

25

26          [1] The Court takes judicial notice that a search for "Uniloc" on PACER results in 712 cases
27   listing a Uniloc entity as plaintiff.  *See* https://pacer.uscourts.gov/.  The number of results is not
     subject to reasonable dispute because it can be "accurately and readily determined from sources
28   whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

United States District Court
Northern District of California

Uniloc Luxembourg, S.A. ("Uniloc Lux"), in May 2018.  (*See* Dkt. No. 355-1 at 124-62.)[2]  At issue in this motion is the scope and meaning of a license agreement that Uniloc Lux entered into with Fortress Credit Co LLC ("Fortress"), as well as two subsequent agreements between Uniloc 2017 and Uniloc Licensing USA ("Uniloc Licensing") and CF Uniloc Holdings LLC ("CF Uniloc").  The following facts are undisputed.

### A.     Fortress License Agreement

On December 14, 2014, Uniloc Lux entered into a revenue sharing agreement ("RSA") with Fortress, which purchased notes, warrants, and future revenue shares from Uniloc Lux.[3] (Dkt. No. 355-1 at 29-54.)  Article II of the RSA (Closing and Terms of the Revenue Stream and Notes) included the issuance of a "Patent License" and provided that:

> Effective as of the Closing Date, [Uniloc Lux] shall grant to [Fortress], for the benefit of the Secured Parties, a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents, which shall be evidenced by, and reflected in, the Patent License Agreement.  [Fortress] and the Secured Parties agree that *[Fortress] shall only use such license following an Event of Default*.

(*Id*. at 37 § 2.8 (emphasis supplied).)  A separately executed Patent License Agreement ("Patent License"), effective December 30, 2014, confirmed the same:

> Subject to the terms and conditions herein and in the Purchase Agreement, [Uniloc Lux] hereby grants to [Fortress] a non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights to make, have made, market use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents and otherwise exploit the Licensed Patents in any lawful matter in [Fortress's] sole and absolute discretion solely for the benefit of the Secured Parties ("Patent License") provided that *[Fortress] shall only use the Patent License following an Event of Default*.

(*Id*. at 57 § 2.1 (emphasis supplied).)

---

[2] All docket citations are to case number 4:20-cv-4355, unless otherwise noted.  In light of the parties' filing method, all page numbers refer to pages in the ECF filing.

[3] Fortress acted as both a purchaser and a collateral agent in the transaction.  While several other parties acquired notes and revenue shares, only Fortress acquired the patent license.  The "Secured Parties" are defined in Appendix I to include both the purchasers and Fortress.  Last, the agreement also involved Uniloc Lux's licensees, which the Court does not address here.

United States District Court
Northern District of California

2

The parties defined an "Event of Default" broadly for purposes of both the RSA and the Patent License. (*See id.* at 46 § 7.1, 57 § 1.) An "Event of Default" may occur from failure to make payments under the RSA, a breach of any covenant, and the making of any materially false representation or warranty. (*Id.* at 46 § 7.1.) However, the RSA explicitly provided that an Event of Default could be "annulled."[4] (*Id.* at 47 § 7.3.) Under this section:

> [O]nce an Event of Default has occurred, such Event of Default shall be deemed to exist be continuing for all purposes of this Agreement until the earlier of (x) Majority Purchasers shall have waived the Event of Default in writing, (y) [Uniloc Lux] shall have cured such Event of Default to the Majority Purchaser's reasonable satisfaction or [Uniloc Lux] or the Event of Default otherwise ceases to exist, or (z) [Fortress and the majority purchasers] have enter into an amendment to this Agreement which by its express terms cures such Event of Default.

(*Id.* at 47-48 § 7.3.)

In addition to the annulment provision in the RSA, the Patent License expressly provided a termination clause. (*Id.* at 58 § 5.) That section permitted the parties to terminate the agreement by mutual agreement, subject to certain survival rights, as follows:

> The Parties may terminate this Agreement at any time by mutual written agreement executed by both Parties provided that any sublicenses granted hereunder prior to the termination of this Agreement shall survive according to the respective terms and conditions of such sublicenses . . . .
>
> Any rights and obligations which by their nature survive and continue after any expiration or termination of this Agreement will survive and continue and will bind the Parties and their successors and assigns, until such rights are extinguished and obligations are fulfilled.

(*Id.* at 58 §§ 5.1, 6.)

In May 2018, the parties executed a Payoff and Termination Agreement with respect to, among other agreements, the RSA and the Patent License. (Dkt. No. 355-2 at 136-37 & §1(d)(i).) However, the "mutual release" therein contained a carve-out which excluded from release "any provision of any Released Agreement that survives the termination." (*Id.* at 139 § 2(b).)

---

[4] The term "annul" appears only in the heading of section 7.3. The RSA provides that headings "are for convenience of reference only" and "shall not limit or otherwise affect the meaning hereof." (Dkt. No. 355-1 at 51 § 9.9.)

United States District Court
Northern District of California

### B.   Uniloc Licensing License Agreement

In May 2018, on the same day that Uniloc Lux terminated its agreements with Fortress and assigned the patents to Uniloc 2017, Uniloc 2017 entered into a license agreement with Uniloc Licensing.  (Dkt. No. 355-1 at 186.)  Under that agreement, Uniloc Licensing acquired the rights to "enforce through litigation" the patents-at-issue outside of the European Union.  (*Id*. at 187 § 2.1.)  The agreement granted Uniloc Licensing the exclusive right to "bring suit," to manage such lawsuits, and to settle the litigation with prior written consent from Uniloc 2017.  (*Id*. at 188 § 3.1.)  However, all proceeds acquired through the litigation, as well as all costs incurred, were to be remitted and invoiced to Uniloc 2017.  (*Id*. at 188 § 3.2.)  In November 2018, Uniloc 2017 and Uniloc Licensing terminated their license agreement.  (Dkt. No. 355-2 at 299 § 1.)

### C.   CF Uniloc Security Agreement

Further on the same day of the Fortress agreement termination, Uniloc 2017 assignment, and Uniloc Licensing license, Uniloc 2017 entered into a security agreement with CF Uniloc. (Dkt. No. 355-2 at 28.)  Under the security agreement, CF Uniloc provided Uniloc 2017 with financing in exchange for, among other things, "Intellectual Property Collateral."  (*Id*. at 35 § 4.9.) Uniloc 2017 agreed not to "sell, lease, transfer or otherwise dispose of . . . any of its assets constituting Collateral" as part of the agreement.  (*Id*. § 7.1(d).)  Uniloc 2017 further covenanted to maintain the validity of the IP collateral, including by paying maintenance fees.  (*Id*. § 4.9(a).)

In November 2018, Uniloc 2017 and CF Uniloc entered into an "Amended and Restated" security agreement.  (*Id*. at 152.)  The amended agreement added language that Uniloc 2017 "has and retains all rights in all Patents owned, controlled, or exclusively licensed" by Uniloc 2017, and has "sole authority and discretion regarding the exercise of all rights under such Patents."  (*Id*. at 160 § 4.9(e).)  The agreement lists maintenance, use, right to exclude, disposition, licensing, and enforcement as rights reserved for Uniloc 2017.  (*Id.*)  However, it maintains all of the provisions described above.  (*See id*. at 152.)

### D.   Procedural History

Each of the above-captioned actions was filed in the Eastern District of Texas in late December 2018.  Google filed its motions to dismiss for lack of standing and improper venue in

4

United States District Court
Northern District of California

April and June 2019.  (Dkt. No. 20.)  The court entered a scheduling order allowing discovery on the issues raised by Google's motion, setting deadlines in August 2019 to complete standing-related document production and depositions.  (Dkt. No. 64.)  The deadlines were subsequently amended to allow depositions in October 2019.  (Dkt. Nos. 73, 80.)  Briefing on Google's renewed motion to dismiss for lack of standing and improper venue was completed in November 2019.  (*See* Dkt. Nos. 99, 117, 127.)

The Texas court transferred the cases, without ruling on the motion to dismiss, to this district in August 2020.  (Dkt. No. 308.)  Each case was assigned to this Court shortly thereafter.  (Dkt. No. 356.)  Based on Google's request, the Court permitted additional discovery into standing issues, along with limited supplemental briefing.  (Dkt. No. 353.)  The parties refiled their briefs and all supporting exhibits on October 2, 2020 (Dkt. No. 355), and Google filed a supplemental brief on October 9, 2020.  (Dkt. No. 358.)  Uniloc 2017 filed its supplemental opposition on October 16 (Dkt. No. 362), and Google its reply on October 23.  (Dkt. No. 363.)  A hearing was held was on November 17, 2020.  (Dkt. No. 367.)

## II.   LEGAL FRAMEWORK

A patent is a "bundle of rights which may be divided and assigned, or retained in whole or part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991).  The inventor initially holds all rights, but may, over time, alienate some or all of them through transfers, assignments, and licenses.  *Alfred E. Mann Found. for Sci. Res. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010).  However, "[w]hile parties are free to assign some or all patent rights as they see fit . . . , this does not mean that the chosen method of division will satisfy standing requirements."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 n.8 (Fed. Cir. 2007).  To retain the ability to bring suit, the rights holder must satisfy two requirements:  Article III and 35 U.S.C. § 281.

### A.   Article III Standing

The well-known and "irreducible" minimum of Article III standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

*Robins*, 136 S.Ct. 1540, 1547 (2016).  The injury in fact must be "concrete and particularized" and "actual or imminent," not merely "conjectural or hypothetical."  *Id*. at 1545 (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)).  Standing is a "threshold requirement" for every federal suit that must be present "at the time the suit is brought."  *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005).

"[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer a legal injury."[5]  *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).  Exclusionary rights "involve the ability to exclude others from practicing an invention or to 'forgive activities that would normally be prohibited under the patent statutes.'"  *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (quoting *Morrow*, 499 F.3d at 1342).  Each exclusionary right is measured relative to each defendant, such that a plaintiff may have standing to sue some infringers but not others.  *WiAV*, 631 F.3d at 1266.  Thus, if the accused infringer has or may obtain a license from a third party, the plaintiff lacks exclusionary rights against that infringer, and therefore lacks standing.  *Id*. at 1266-67.  An injury in fact occurs "when a party performs at least one prohibited action with respect to the patented invention that violates [the plaintiff's] exclusionary rights."  *Morrow*, 499 F.3d at 1339.

Standing implicates the court's subject matter jurisdiction and may be challenged under Federal Rule 12(b)(1).  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  A defendant may challenge a plaintiff's standing in one of two ways.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  In a "facial" attack, the defendant "accepts the truth of the plaintiff's allegations but asserts that they are 'insufficient on their face to invoke federal jurisdiction.'"  *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  In a "factual" attack, the defendant "contests the truth of the plaintiff's factual allegations, usually by introducing evidence

---

[5] Federal Circuit law governs an entity's constitutional standing in a patent infringement action.  *WiAV*, 631 F.3d at 1263.  However, regional circuit law applies to interpretations of the Federal Rules of Civil Procedure in most cases.  *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).

United States District Court
Northern District of California

outside the pleadings." *Id.* The court treats facial attacks similar to Rule 12(b)(6) motions—assuming the truth of plaintiff's allegations and drawing all inferences in favor of plaintiff—but it analyzes factual attacks under the evidentiary standard that governs summary judgment. *Id.* Thus, to survive a factual attack, the plaintiff has the burden to produce "competent proof" that demonstrates standing by a preponderance of the evidence. *Id.*

## B.    35 U.S.C. § 281

Section 281 authorizes a "patentee" to bring an action for patent infringement. 35 U.S.C. § 281. The statute defines "patentee" to include both the original patent owner and the "successors in title." 35 U.S.C. § 100(d). A transfer of title, called an "assignment," is governed by 35 U.S.C. § 261. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000).

The determination of a "patentee" is an all-or-nothing proposition: a patent has only one "patentee" at a given time and cannot have "multiple separate owners." *Alfred E. Mann.*, 604 F.3d at 1359. Thus, the party that first obtains the patent remains the "patentee" until it assigns those patents to another. *Id.* Whether an assignment took place does not depend on labels. *Lone Star*, 925 F.3d at 1229. Rather, the court must examine the "totality" of an agreement to determine whether the patent owner transferred "all substantial rights" in the patent to another party. *Id.* "Substantial rights" are not simply a tally of the number of rights, but also depend on the nature of those rights. *Lone Star*, 925 F.3d at 1229. For example, the Federal Circuit considers the rights to enforcement and alienation particularly important. *See id.* at 1231. Thus, in *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, the court found that a patentee which retained the right to authorize lawsuits and prevent assignments transferred fewer than all substantial rights. 248 F.3d 1333, 1344-45 (Fed Cir. 2001).

Even if a party is not the patentee, it may bring suit jointly with the patentee if it has Article III standing—*i.e.,* if it is an exclusive licensee.[6] *Morrow*, 499 F.3d at 1340. In those

---

[6] In *Morrow*, the Federal Circuit laid out three categories of plaintiffs: (1) a patentee that holds all exclusionary rights, who may always bring suit, (2) an exclusive licensee, who may bring suit jointly with the patentee, and (3) a nonexclusive patentee, who may neither bring nor join a lawsuit. 499 F.3d at 1339-41. However, the court stressed that labels are not determinative. *Id.* at 1340 n.7; *see Lone Star*, 925 F.3d at 1234-39 (finding that a plaintiff fits in the second category despite not being an exclusive licensee).

United States District Court
Northern District of California

cases, the patent owner may be joined involuntarily as a party holding the patent title in trust for the exclusive licensee. *Intellectual Prop. Dev.*, 248 F.3d at 1347. For similar reasons, where the patent owner granted an exclusive license but stopped short of transferring all substantial rights, the exclusive licensee must be joined before the patent owner can bring suit for infringement of that right. *Alfred E. Mann*, 604 F.3d at 1360. Where the patentee cannot be joined, the court has discretion to dismiss the suit under Rule 19(b). *Lone Star*, 925 F.3d at 1236. But it is legal error to dismiss the suit without first attempting joinder. *Id*. at 1237-39.

Although the Federal Circuit has occasionally referred to section 281 as "jurisdictional," it recently clarified that the statue relates only to circumstances "when a party may obtain relief under the patent laws," not subject matter jurisdiction. *Id.* at 1235. Thus, a challenge to plaintiff's compliance with section 281 is properly brought under Federal Rule 12(b)(6). *See id*. at 1236 n.6; *AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1379 (Fed. Cir. 2020). Under the standard for that Rule, the plaintiff must "plead[] factual content to allow the court to draw the reasonable inference that" the plaintiff complies with section 281. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Dolores Press, Inc. v. Robinson*, 766 F. Appx. 449, 452 (9th Cir. 2019). The court limits its review to the pleadings, as well as documents subject to judicial notice or incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *see, e.g.*, *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109-10 (9th Cir. 2013) (disregarding extrinsic evidence on a statutory "standing" 12(b)(6) motion).

## III. DISCUSSION

Google raises three grounds for dismissal in its motion. First, Google argues that Uniloc 2017 lacks Article III standing because it cannot exclude Google from practicing the invention based on Fortress's ability to license Google. Second, Google argues that Uniloc 2017 lacks "all substantial rights" because it transferred the right to sue to Uniloc Licensing. Finally, Google argues that Uniloc 2017 lacks "all substantial rights" because CF Uniloc retains control over settlement and patent assignment. Uniloc 2017 disputes each of these characterizations. In its supplemental response, Uniloc 2017 further argues that under *Lone Star*, Uniloc 2017 has Article III standing because it can forgive and sue for infringement and need not have "all substantial

8

rights" to bring suit.  The Court addresses Uniloc 2017's legal arguments and then each of the Article III and section 281 issues.

### A.   *Lone Star*

In *Lone Star*, a patentee, AMD, transferred "all right, title and interest" in its patents to another entity, Lone Star, subject to restrictions.  925 F.3d at 1227.  Under the agreement, Lone Star could only sue specific "unlicensed entities" listed in the agreement, but if it tried to sue unlisted entities, AMD could negate the suit by granting them sublicenses at its sole discretion.  *Id.* at 1227-28.  Lone Star brought suit against listed targets.  *Id.* at 1232.  The Federal Circuit found that AMD's retained rights over enforcement against unlisted entities meant that it did not transfer "all substantial rights" sufficient to make Lone Star the "patentee" under section 281.  *Id.* at 1231-32.  However, the court found that *with respect to the defendants*, who were listed targets, Lone Star had Article III standing because it could exclude them from practicing the invention, could forgive infringement, and could grant licenses.  *Id.* at 1234.

In so finding, the court distinguished *Morrow*, where the party could not grant licenses or forgive infringement.  *Id.* at 1234.  In *Morrow*, two entities, AHC and GUCLT, shared rights to a patent.  499 F.3d at 1338.  GUCLT had the exclusive right to sue infringers and collect damages, while AHLT retained all remaining rights, including the right to grant licenses.  *Id.*  The Federal Circuit found that GUCLT lacked Article III standing because AHC had the right to license any accused infringer.  *Id.* at 1342.  The court further noted that GUCLT "does not have the right to license or sublicense or otherwise forgive activities that would normally be prohibited under the patent statutes," which is also "an important patent right."[7]  *Id.*

Uniloc 2017 now argues that it has Article III standing under *Lone Star* because it has the right to "exclude others" by bringing suit and to "forgive infringement" through licensing.  As to the right to sue, *Morrow* and its cited cases preclude the argument.  As noted there, the right to sue does not constitute an exclusionary right but an enforcement of other rights (e.g., to make or use

---

[7] Like many earlier standing decisions, *Morrow* discusses "all substantial rights" under an Article III heading.  *See id.* at 1341.  However, under *Lone Star*, section 281 requirements are not related to standing.  925 F.3d at 1234-35.

the invention). 499 F.3d at 1340, 1342; *see Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 39 (1923) (the right to sue "carried no part of the title to the patent or interest in it"). Where those rights are not exclusive, the right to sue does not change the equation.

With regards to the right to license, the question is closer. *Morrow* holds that the right to forgive infringement is "implicit" in the right to exclude. *Id*. at 1341; *see also Prima Tek*, 222 F.3d at 1379. Elsewhere, however, the Federal Circuit has consistently found that a nonexclusive licensee who can grant licenses lacks standing to join or bring a suit. *See, e.g.*, *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1194 (Fed. Cir. 2007) (finding that a party possessing the right to grant licenses lacked Article III standing, even when joined with the patentee). *Lone Star* does not purport to disturb this principle, but, on the contrary, affirms that joinder is only appropriate where a party possesses "exclusionary" rights. 925 F.3d at 1229. Accordingly, the Court reads *Lone Star* consistent with prior case law to mean that the right to forgive infringement does not confer standing where it is nonexclusive—*i.e.*, where others can also forgive infringement.

Relatedly, Uniloc 2017 argues that the Fortress license cannot defeat standing because it is nonexclusive. The dispute arises from an admittedly-confusing distinction between an exclusive and a "sole" license. Generally, an exclusive licensee need not be the only licensee to have exclusionary rights. *See Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1004-05 (9th Cir. 2015)[8] (analyzing Federal Circuit law); *Western Elec. Co. v. Pacent Rep. Corp.*, 42 F.2d 116, 119 (2d Cir. 1930). For example, a patentee may grant a license to one party and then grant another license to a second party, promising the latter not to grant any more licenses. *Western Elec.*, 42 F.2d at 119. The second licensee then has exclusionary rights vis-à-vis the world *except* for the first licensee. *Id.* Thus, the mere fact that multiple parties have licenses, or even exclusionary rights, is not dispositive. *WiAV*, 631 F.3d at 1266.

---

[8] In *Minden*, the Ninth Circuit found that a stock photography company authorized to act as photographers' sole licensing agent had standing to sue, notwithstanding the photographers' ability to license themselves. 795 F.3d at 1005. As the court later clarified, the key feature lay in the company's role as the "sole and exclusive" licensing agent. *DRK Photo v. McGraw-Hill Global Edu. Holdings, LLC*, 870 F.3d 978, 983-85 (9th Cir. 2017). By contrast, if photographers retained authority to allow other licensing agents, none of them have standing. *See id.*

The relevant issue is whether a plaintiff could exclude a *particular* defendant to have standing.  *Id.*; *see also Lone Star*, 925 F.3d at 1232-34.[9]  While Uniloc 2017 is correct that the mere existence of other licenses is not dispositive, Fortress's ability to license Google specifically defeats standing.  *See WiAV*, 631 F.3d at 1266; *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1348 (Fed. Cir. 2016); *Tech. Props. Ltd. LLC v. Canon Inc.*, No. C 14-3640 CW, 2016 WL 4447142, at *2 (N.D. Cal. Aug. 24, 2016); *SonoSim, Inc. v. Medaphor Ltd.*, No. CV 16-2847-GW(MRWx), 2016 WL 7479363, at *3 (C.D. Cal. Oct. 17, 2016).

Last, Uniloc 2017 argues that as the legal owner of the patents, it has Article III standing and need not have "all substantial rights."  The argument is meritless.  Article III and a section 281 impose separate requirements that must each be satisfied to bring suit.[10]  *See Spokeo*, 136 S.Ct. at 1549 ("Article III standing requires a concrete injury even in the context of a statutory violation."); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.").  A patent owner that alienates an exclusionary right to another may lack Article III standing to sue for violation of that right.  *See Lone Star*, 925 F.3d at 1234 (noting that

---

[9] Uniloc 2017's cited cases—all of which involved "prudential standing" under section 281 and thus lack direct relevance—are consistent.  *See Alfred E. Mann*, 604 F.3d at 1361-62 (finding exclusionary rights, despite another party's ability to license infringers, because the party had to pay plaintiff royalties for licensing); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (finding substantial rights where patentee retained revisionary interest after a termination date); *AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1320-21 (Fed. Cir. 2009) (addressing a licensee's, not the patent owner's, ability to sue without joinder); *Prima-Tek*, 222 F.3d at 1380 (finding exclusionary rights where a third party's rights were "extinguished").

[10] Congress cannot legislate around Article III by creating statutory rights.  *See Spokeo*, 136 S.Ct. at 1544-46 (finding that plaintiff who had a right to sue under the Federal Credit Reporting Act may lack standing).  At the same time, courts cannot create a private right of action where Congress has not expressly or implicitly provided one.  *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.").  Indeed, where Congress has expressly provided a right of action to particular persons, courts "are extremely reluctant to imply a cause of action" that is significantly broader.  *Touche Ross & Co. v. Redington*, 442 U.S. at 560, 574 (1979); *see also Sandoval*, 532 U.S. at 286-87 (without a statutory cause of action, "courts may not create one, no matter how . . . compatible with the statute.").

United States District Court
Northern District of California

"constitutional standing also does not depend on labels"); *Alfred E. Mann*, 604 F.3d at 1362 (requiring exclusionary rights for the patentee).[11]  Similarly, a party that possesses exclusionary rights (and therefore standing) but that cannot join the patentee may be dismissed for failure to state a claim.  *See Indep. Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459 (1926); *Lone Star*, 925 F.3d at 1236 n.6.  Accordingly, both requirements must be satisfied.[12]

### B.  Fortress License

Google first argues that the Fortress license defeats Uniloc 2017's exclusionary rights against Google because Fortress could have licensed Google's alleged infringement at the suit's inception.  The record establishes that in 2014, Fortress obtained a "non-exclusive," "sub-licensable," and "irrevocable" license to the patents-at-issue.  (Dkt. No. 355-1 at 57.)  By its plain terms, the RSA effected an immediate transfer of rights by using the term "hereby grants."  *See Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) (the word "hereby" effects immediate transfer).  Indeed, the RSA expressly refers to the license as a "present grant."  (*See id.* at 57 § 2.3.)  However, the RSA also provides that Fortress "shall only use the Patent License following an Event of Default" (*id.* at 57 § 2.1) and that the agreement could terminate "at any time by mutual written agreement" (*id.* at 58 § 5.1).

Uniloc 2017 argues that Fortress could not have licensed Google's activities for three reasons.  First, there was no "event of default," and, accordingly, Fortress' license right never vested.  Second, even if there was a default, that default was cured and therefore annulled before the suit was filed.  Third, the license terminated in May 2018, before Uniloc 2017 filed its complaint.  The Court considers each.

---

[11] At the very least, a patent owner must *articulate* some concrete injury in the absence of exclusionary rights.  An injury based on legal title alone is entirely abstract and thus cannot demonstrate an injury-*in-fact*.

[12] In *Schwendimann v. Artkwright Advanced Coating, Inc.*, the Federal Circuit found that there was no "standing issue to be decided" in the appeal because the plaintiff alleged a case or controversy through allegations that "she is the owner by assignment of the [asserted] patent and Appellants infringed that patent."  959 F.3d 1065, 1071 (Fed. Cir. 2020).  However, when read in context, that sentence merely explains that the issue that *was* decided in the appeal—patentee status under section 281—is not related to Article III standing.  In any case, it is dicta.

United States District Court
Northern District of California

United States District Court
Northern District of California

a.     *Event of Default*

The RSA, whose definitions are incorporated in the patent license agreement, defines an "Event of Default" to include three scenarios:  (1) Uniloc Lux "fail[s] to make any payment due," (2) Uniloc Lux "fail[s] to perform or observe any of the covenants or agreements" after thirty days of gaining knowledge or receiving written notice, and (3) "[a]ny representation or warranty of or with respect to [Uniloc Lux]" in the agreement or any financial statement is "false in any material respect on the date as of which it was made."  (Dkt No. 355-1 at 46 § 7.1.)

Google introduces evidence that Uniloc Lux breached the RSA under the second and third provisions.  First, Google shows that Uniloc Lux repeatedly failed to meet its revenue targets so as to satisfy its covenants.  Specifically, Uniloc Lux's report to its board of directors shows that Uniloc Lux earned only $ 14,360,989 in licensing and litigation revenue in June 2017, even though it covenanted to receive at least $20,000,000.[13]  (*Id.* at 82, 40 § 6.2.2.)  Second, Google claims that Uniloc Lux breached the RSA, as well an amendment executed in May 2017, by making materially false warranties.  Namely, the RSA warranted that "all of the Patents . . . have not been adjudged invalid or unenforceable, in whole or in part," and none are "at this time the subject to any challenge to their validity or enforceability."  (*Id.* at 38-39 § 4.5.)  However, two of those patents were challenged as invalid in *inter partes* review and on a section 101 motion in December 2013 and 2014.  (*See id.* at 97, 101.)

Uniloc 2017 does not genuinely dispute that it failed to reach its monetization covenants or

---

[13] The Court notes here that both sides have submitted evidence from parallel litigation between plaintiff and Apple Inc. and bypassed compliance with Federal Rules of Evidence. The Court accepts the parties' agreement on the record that there was no objection to either side's approach.  However, the parties are on notice that such stipulations should be in writing and filed or the Court should be provided with a complete record.

Furthermore, the Court notes that Google failed to submit any evidence to support certain arguments.  For instance, Google claims that Uniloc Lux failed to realize $20 million in March 2017, but cites no evidence in the record to support the claim.  (*See* Dkt. No. 355-1 at 4:13, 4:16.) Google also cites deposition testimony that is not in the record at all, as well as attorney argument by Google's counsel.  (*See id* at 4:19 (citing "Exhibit G, 66:4-67:6"), 5:8 (citing, in a footnote, a declaration by a Quinn Emanuel attorney stating, without evidence, that an attached list shows invalid patents).)  Moreover, many of the agreements submitted by Google are missing pages, including at least three pages in the RSA.  (*See* Dkt. No. 355-1 at 48-49.)  Google is strongly encouraged to be more careful with its evidence going forward.

that some patents were challenged as invalid.  Indeed, Judge Alsup in this district has already

found that "[t]he Unilocs defaulted" by missing their monetization targets.  *See Uniloc USA Inc. v.*

*Apple, Inc.*, Case No. 18-00358 WHA, Dkt. No. 186 (Dec. 4, 2020).   Instead it suggests that the

Court should ignore the plain language of the agreements with the evidentiary proffer and accept,

as true, two declarations of James Palmer, the managing director of the IP Finance Group at

Fortress's affiliate, Fortress Investment Group.[14]  (*See* Dkt. No. 355-2 at 394, 400.)  Therein, Mr.

Palmer states that Fortress was satisfied with Uniloc Lux's monetization efforts, no longer

considered the minimums in the agreements significant, and did not consider the failure to

mention validity challenges to two of the patents material.  (*Id*. at 396-97.)

There are multiple issues with the Palmer declarations.  First, their reliability is suspect.

Not only do they fail to address the breaches, but Mr. Palmer is a board member of Uniloc 2017

and therefore has a self-interest in the Court not finding a breach.  (*See* Dkt. No. 358-2 at 49:4-7;

*see also id.* at 49:15-50:7.)  Ordinarily, the self-serving nature of a declaration is not grounds for

exclusion, but it does impact the weight to be afforded the evidence.  *Nigro v. Sears, Roebuck &*

*Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  Second, the declarations fail to comply with Rule

56(c)(4), which applies to a factual attack under Rule 12(b)(1).  *See Phigenix, Inc. v. Immunogen,*

*Inc.*, 845 F.3d 1168, 1173 (Fed. Cir. 2017) (finding lack of standing where opposing declaration

failed to comply with Rule 56).  Rule 56(c)(4) requires a declaration to be "made on personal

knowledge," "set out facts that would be admissible in evidence," and "show that the . . . declarant

is competent to testify on the matters stated."  The Palmer declarations demonstrate none of these.

While Uniloc 2017 claimed at the hearing that Mr. Palmer—an employee of Fortress' *affiliate*—

was involved in negotiations with Uniloc Lux, and Google has no knowledge to the contrary, there

is no evidence *on the record* to demonstrate personal knowledge.[15]  Here, the declarations are each

---

[14] Here, again, the Palmer declaration was submitted in the case with Apple Inc.  Because
the parties do not object, the Court considers the declarations but notes, again, that the evidence
should have been submitted through stipulation.

[15] The concern is not trivial.  First, the RSA requires a "majority purchasers" to find cure
or waiver.  (*See* Dkt. No. 355-1 at 47.)  While Uniloc 2017 claims, without evidence, that each of

1    self-serving, conclusory, and lacking in substantive foundation, and thus the court affords them

2    little to no weight.  *Nigro*, 784 F.3d at 497; *Phigenix*, 845 F.3d at 1173.

3        Last, as noted by Judge Alsup, the Palmer declarations are contrary to the plain language

4    of the agreement.  *See Uniloc USA Inc. v. Apple, Inc.*, Case No. 18-00358 WHA, Dkt. No. 186 at 9

5    (Dec. 4, 2020).  The RSA expressly sets out that failure to achieve covenants, such as the

6    monetization targets, constitutes an event of breach.  (Dkt. No. 355-1 at 22.)  Neither Fortress not

7    Uniloc 2017 can now rewrite the agreement outside the formal amendment process.  Mr. Palmer's

8    bare opinion that he did not consider Uniloc Lux to be in breach does not defeat the undisputed

9    fact that Uniloc Lux missed its monetization target in June 2017.

10        Accordingly, the Court finds that Uniloc Lux breached the RSA sufficient for the patent

11    license to vest before Uniloc 2017 filed its lawsuit.

12                      *b.*    *Cure or Waiver*

13        Uniloc 2017 next argues that Uniloc Lux cured any breach of the RSA.  Under the RSA, a

14    default is deemed to no longer exist if (1) the majority purchasers waive the event of default in

15    writing, (2) Uniloc Lux cures the default to the majority purchasers' reasonable satisfaction or the

16    default otherwise ceases to exist, or (3) the parties enter into an agreement that "by its terms cures

17    such" default.  (*Id.* at 48 § 73.)  Judge Alsup has already found that Uniloc Lux did nothing to cure

18    its failure to achieve the monetization targets prior to May 2017.  *See Uniloc USA Inc. v. Apple,*

19    *Inc.*, Case No. 18-00358 WHA, Dkt. No. 186 at 8 (Dec. 4, 2020).  The Court finds the analysis

20    persuasive and adopts it here.

21        Uniloc 2017's sole remaining argument is that the termination agreement executed in May

22    2018 annulled the earlier breaches.  In its brief opposing Google's renewed motion to dismiss,

23    ───────────────

24    the RSA purchasers is a Fortress entity, there is no evidence in the record to support the claim.
     Thus, Mr. Palmer must have personal knowledge of not only Fortress but each of the entities listed

25    in the agreement, including CF DB EZ LLC and CF DB EZ 2017 LLC.  Second, as Google points
     out, Mr. Palmer's deposition in the Apple case is filled with suppositional language regarding

26    what he "thought" about Uniloc Lux's breach, which does not suggest personal knowledge of
     what the entities actually intended regarding Uniloc Lux's failure to achieve the monetization

27    covenants.  (*See* Dkt. No. 358-2.)  Rule 56 thus bars the declarations and the related (equally
     conclusory) deposition testimony.  The Levy deposition, which demonstrates nothing but lack of

28    knowledge, is similarly not helpful.  (*See* Dkt. No. 363-3.)

United States District Court
Northern District of California

Uniloc 2017 argued that the termination agreement satisfies each standard for annulment.  (*See* Dkt. No. 355-2 at 7-9.)  However, at the hearing for this motion, Uniloc 2017 expressly waived any argument not based on cure.  Accordingly, the Court considers only whether Uniloc Lux cured the event of default through the termination agreement.

On balance, it did not.  The termination agreement provides that Fortress "releases, waives and forever discharges" Uniloc Lux from "any and all Claims" and states that neither party "shall have any further obligation or liability."  (Dkt. No. 355-2 at 139 § 2(b).)  However, a release of "claims" is not the same of a release of "rights."[16]  The termination agreement defines "Claims" to encompass many things, none of which are Events of Default.  (*See id.* at 138 § 2(a).)  By contrast, the agreement excludes from the release "any provision of any Released Agreement that survives the termination."  (*Id.* at 139§ 2 (b).)  As noted above, the Patent License includes a "Survival" clause that provides that all rights "which by their nature survive" would "survive and continue" until "extinguished and obligations are fulfilled."  (Dkt. No. 355-1 at 58 § 6.)  Even if the release included any "obligation" which had not been "fulfilled," it does not operate to "extinguish" the license, only to "release."[17]  In any case, the termination agreement does not by its terms "cure" the failure to achieve monetization revenues because it does not involve any affirmative act by Uniloc 2017 that would redress the default, only an agreement not to sue over it.

Accordingly, Uniloc 2017 has not shown that any cure of the event of default operated to prevent Fortress from using the patent license.

### c.   *Termination*

Uniloc 2017 last argues that Fortress' Patent License itself was terminated by the termination agreement.  The Court begins its analysis with the language of the Patent License agreement, which provides that the parties "may terminate this Agreement at any time by mutual

---

[16] As noted above, the Patent License granted a *present* license to Fortress and merely specified conditions of use.  Fortress' use of the license is therefore neither a claim nor an obligation, regardless of the fact that it arises from an event of default.

[17] The common definitions of "extinguish" requires an affirmative act.  *See Extinguish*, Merriam-Webster Dictionary ("To cause to be void"); *Extinguish*, Black's Law Dictionary (11th Ed. 2019) ("To bring to an end; to put an end to").

United States District Court
Northern District of California

1   written agreement executed by both Parties" but that "[a]ny rights and obligations which by their

2   nature survive and continue after any expiration or termination of this Agreement will survive and

3   continue." (Dkt. No. 355-1 at 58 §§ 5.1, 6.)  Otherwise, the plain terms of the agreement state that

4   it shall end with the expiration of the licensed patents, the running of the statute of limitations, or

5   the termination of any sublicensing agreement, whichever is later.  (*Id*. § 5.2.)  A breach of the

6   agreement *does not* constitute grounds for termination.  (*Id*.)

7        Resolution of this issue hinges on the meaning of the word "irrevocable."[18]  Google argues

8   that the parties intended Fortress' license to survive termination because the agreement granted "a

9   non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and

10  worldwide license," focusing on the word "irrevocable." (*Id*. at 57.)  Google argues that the plain

11  meaning of the term "irrevocable" means "not revoked for any reason" and "impossible to retract

12  or revoke," as found previously under New York law.  *See Nano-Proprietary v. Canon, Inc.*, 537

13  F.3d 394, 400 (5th Cir. 2008) (finding that under New York law, "irrevocable" unambiguously

14  means "committed beyond recall"); *State Street Global Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d

15  322, 357 (S.D.N.Y. 2020) ("irrevocable" means "impossible to retract or revoke"); *In re Provider*

16  *Meds., L.L.C.*, 907 F.3d 845, 855-56 (5th Cir. 2018) (holding that "irrevocable" means something

17  beyond "not revocable at will" to indicate "not revoked for any reason"); *cf. Cafferty v. Scotti*

18  *Bros. Records, Inc.*, 969 F. Supp. 193, 198 (S.D.N.Y. 1999) (finding that "irrevocably" granted

19  license survived termination of the agreement).

20        Uniloc 2017 attempts to distinguish these cases by arguing that they dealt with a unilateral

21  attempt to revoke a license due to breach of contract, not a mutual agreement to terminate.  While

22

23        [18] The law applicable to this contract's interpretation may be either New York or Federal
24   Circuit law.  The RSA states that the agreement shall be governed by New York state law.  (Dkt.
    No. 355-1 at 51.)  However, the Federal Circuit has frequently applied its own law to interpret
25   contracts where they are "bound up with the question of standing in patent cases." *DDB Techs.,*
    *L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).  Moreover, the Federal
26   Circuit has applied its own law to determine whether a license survives termination.  *Fraunhofer-*
    *Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d
27   1372, 1380 (Fed. Cir. 2019).  Because the parties do not brief the issue, the Court assumes that
    there would be no material difference between the various jurisdictions and considers both New
28   York and Federal Circuit law for the Fortress license.

correct on the facts, Uniloc 2017's argument misses that each of the above cases expressly defines the term "irrevocable" to mean "not revocable for *any* reason." The plain meaning of the term "irrevocable" thus sweeps significantly broader than the specific facts of those cases. Where the contract terms are clear and unambiguous, New York requires the Court to apply it as written, in accord with their plain meaning.[19] *See State Street*, 431 F. Supp. 3d at 357; *MHR Cap. Ptners. LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009).

Moreover, even assuming, *arguendo*, that Uniloc 2017 had cast doubt on the meaning of "irrevocable," it would still fail to show standing. At most, the patent license is ambiguous with respect to its inferences, not its plain meaning. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) ("Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language."). Uniloc 2017 argues that adopting Google's construction would render the termination clause superfluous because there would be nothing to terminate if Fortress' license survives any mutual agreement. However, Uniloc 2017's interpretation also renders terms superfluous. In particular, if the term "irrevocable" means that Uniloc Lux could not revoke the license for breach of contract, it would be superfluous because the termination clause *already provides* that breach of contract does not present grounds for termination. Accordingly, Uniloc 2017's interpretation also renders terms superfluous, and the Court must decide between two disfavored interpretations. *See Nano-Proprietary*, 537 F.3d at 400; *State Street*, 431 F. Supp. 3d at 357.

At this stage, then, Uniloc 2017 must have anticipated that the Court may find the contract ambiguous and prepared extrinsic evidence to support its interpretation of the agreement. It did

---

[19] The Federal Circuit has indirectly addressed the meaning of the term "irrevocable" in *Fraunhofer-Gesellschaft*, 940 F.3d at 1380. There, the patentee had granted an irrevocable license to a third party, who then granted several irrevocable sublicenses. *Id*. at 1375-76. The third-party then entered bankruptcy proceedings where it rejected the license agreement. *Id*. The patentee argued that the proceedings terminated the agreement, but the Federal Circuit found the evidence insufficient in that respect. *Id*. at 1379. The court separately addressed whether the irrevocable sub-licenses survived and found the question not resolvable as a matter of law (i.e., ambiguous). *Id*. at 1381. For the reasons described here, even if the patent license is found to be ambiguous, Uniloc 2017 has failed to establish standing to bring suit.

United States District Court
Northern District of California

not do so.  Despite having notice of Google's arguments since April 2019, together with multiple extensions and opportunities to produce evidence, Uniloc 2017 has produced *no* evidence regarding the parties' intent for the term "irrevocable."[20]  Nor did Uniloc 2017 produce any evidence regarding the parties' intent for the survival clause, which expressly states that rights that "by their nature survive" would continue beyond termination.  Instead, Uniloc 2017 relies solely on the deficient declarations and deposition of Mr. Palmer, the Fortress affiliate employee whose name appears on none of the contracts and whose personal knowledge and reliability are deeply in question.  At this stage of the proceedings, that does not suffice.

Accordingly, this motion is resolved on the burdens.  The burden to demonstrate standing through "competent proof" falls squarely on Uniloc 2017.  *See Sicom*, 427 F.3d at 975-76; *Leite*, 749 F.3d at 1121.  Ultimately, the parties to the present agreements were sophisticated and knowledgeable.  The RSA set forth their business relationship, which was the same whether the relationship succeeded or soured.  The Court is not inclined to ignore the plain language of the agreement for the convenience of the plaintiff.  Uniloc 2017 has a high burden to demonstrate that the agreement means something other than what it says, and it has not met that burden.  The case is therefore **DISMISSED** for lack of subject matter jurisdiction.

## C.   Section 281

Google also claims that Uniloc 2017 lacks a cause of action under section 281 because it is not the "patentee" or "successor in title."  As support, Google seeks to have the Court interpret two agreements with Uniloc Licensing and CF Uniloc, which gave the former the exclusive right

---

[20] Instead of producing competent evidence, Uniloc 2017 relies on inapplicable case law. *In re Zimmerman (Cohen)*, 236 N.Y. 15, 19-20 (1923) concerned the legislature's ability to render arbitration contracts irrevocable under the unique history of arbitration law.  *See 21 Williston on Contracts* § 57:53 (4th Ed. 2020).  Modern New York arbitration law holds that such clauses survive termination, including general release clauses.  *See Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599, 601 (1997).  *In re Huntington*, ADV 11-4015-BDL, 2013 WL 6098405 (B.A.P. 9th Cir. Oct. 29, 2013) found that a party waived its right to argue that an assignment was irrevocable by agreeing to revoke it.  *Carbonneau v. Lague, Inc.*, 134 Vt. 175, 177, 352 A.2d 694, 696 (1976) found that a party's license to wire land was terminated when the licensee "consent[ed] to a substitution in in the relation of landlord/tenant for that of licensor/licensee."  And *Bendetson v. Killarney, Inc.*, 154 N.H. 637, 643, 913 A.2d 756, 761 (2006) involved an express qualification to irrevocable rights ("irrevocable unless . . . ").

United States District Court
Northern District of California

1    to sue and the latter certain rights over "IP collateral."[21]

2        As to the Uniloc Licensing agreement, Uniloc 2017 introduces evidence that the rights

3    were terminated before the suit was brought, which leaves little remaining ground for Google's

4    motion.  (*See* Dkt. No. 355-2 at 302.)  Google cites deposition testimony by Uniloc 2017's

5    corporate representative that Uniloc Licensing "manages ultimately the intellectual property and

6    patents, the litigation" of Uniloc 2017 and provides "services that are related to that."  (Dkt. No.

7    363-5 at 47:18-48:5 ).)  This testimony, however, is insufficient to establish that Uniloc Licensing

8    has substantial *rights* in the patents (rather than obligations arising from services to Uniloc 2017).

9        With respect to the CF Uniloc agreement, the language appears to be ambiguous, since the

10   requirement to not "sell, lease, transfer or otherwise dispose of" the patents does not clearly cover

11   settlement and licensing, particularly in light of the language added in the amended and restated

12   agreement.  Moreover, even if the agreement gave CF Uniloc control over licensing, it is difficult

13   to see how that constitutes "all substantial rights" when Uniloc 2017 remains the party authorized

14   to exploit the invention and sue and license infringers.  *Alfred E. Mann* explains that a party

15   remains the patentee until it grants "all substantial rights" to another.  *See* 604 F.3d at 1359-60.

16   Thus, the inquiry is not whether the patentee holds all substantial rights, but whether it *transferred*

17   such rights.[22]  Here, even if the security agreement gave CF Uniloc some substantial rights, at least

18   as many remain with Uniloc 2017, including the right to sue, the right to practice the invention,

19   and the right to license.  Google therefore has not established that the CF Uniloc agreement

20   constitutes an assignment that makes CF Uniloc the "patentee" under section 281.

21       Accordingly, the Court denies that part of the motion at this stage.

22
_____

23       [21] Google has not established that either contract is subject to incorporation by reference or judicial notice to be considered on a 12(b)(6) motion to dismiss.  However, the parties waived
24   their objections on this point during the hearing on this motion.

25       [22] The Federal Circuit often finds that a party remains the patentee despite having fewer rights than a licensee, so long as it transferred fewer than all substantial rights.  *See, e.g.*, *Alfred E.*
26   *Mann*, 604 F.3d at 1361-62 (finding that licensor holding "secondary" rights to sue remained the patentee); *Sicom*, 427 F.3d at 978-79 (holding that a licensor remained the patentee based on rights
27   to sue for noncommercial infringement and to consent to assignment).  The inquiry is not about comparing rights transferred against those reserved, but about whether the agreement as a whole
28   demonstrates an assignment.  *Lone Star*, 925 F.3d at 1229

United States District Court
Northern District of California

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Google's motions to dismiss for lack of standing and **DISMISSES** the above-captioned cases.[23]  Uniloc 2017's motion to seal (Dkt. No. 354 is **GRANTED**, and Google's motion to seal (Dkt. No. 357) is **DENIED**.  Google shall file unredacted versions of its exhibits within seven days.  The Clerk shall close each case.


**IT IS SO ORDERED.**


Dated:  December 22, 2020

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

---

[23] Uniloc 2017 seeks to seal portions of two exhibits that identify third-party licensees and the amounts they paid for each license, as well as their confidential payment information.  (Dkt. No. 354.)  Pricing terms and confidential financial information are routinely sealed as materials that may be used to harass or harm a party's competitive standing.  *See In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2009); *In re Qualcomm Litig.*, No. 3:17-cv-0108-GPC-MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017).  The requests are narrowly tailored and do not prevent the public from understanding the issues in this motion.  Accordingly, Uniloc 2017's motion seal is **GRANTED**.  Google's motion to seal exhibits in its supplemental brief (Dkt. No. 357) is based entirely on Uniloc 2017's confidentiality designations, and Uniloc 2017 filed a declaration stating that it does not wish to keep any of the materials sealed.  (Dkt. No. 360.)  Accordingly, that motion is **DENIED**.  The parties' requests to file supplemental briefing to address developments in other cases are **DENIED** as moot.  (Case No. 20-5330, Dkt. Nos. 351, 356.)